UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO. 2:01CR 13 JM |
| | ) | |
| THOMAS J. ROSBY | ) | |

GOVERNMENT'S SENTENCING MEMORANDUM

Comes now the United States of America, by and through United States Attorney Joseph S. Van Bokkelen and Assistant United States Attorneys Orest Szewciw and Robin Morlock and respectfully submit this Sentencing Memorandum regarding defendant Thomas J. Rosby, who is scheduled to be sentenced on April 21, 2005. For the reasons provided below, the government recommends a sentence at the high end of applicable Sentencing Guideline range.

I.   Background

In *United States v. Booker*, 2005 WL 50108 (U.S. Jan. 12, 2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." *Booker*, 2005 WL 50108, at 16. This ruling results in a system in which the sentencing court, while informed by the Guidelines, may impose any sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to review by the Court of Appeals for "reasonableness." *Id*. at 24.

In the wake of *Booker*, this Court must make a correct calculation under the existing Sentencing Guidelines, and then consider the final guideline calculation when determining the sentence to be imposed. Justice Breyer's majority opinion directed that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Id.* at 27.

The position of the government is that, absent highly unusual circumstances, the sentence in a criminal case should fall within the guideline range as determined by the Court. This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in *Booker* recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. *See, e.g.*, *id.* at 21 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); *id.* at 19 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); *id.* at 42 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); *id.* at 47 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").

The Sentencing Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of 15 years of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The

Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ."

Thus, fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing, and should occur absent unusual circumstances. The government commends to the Court's attention the scholarly opinion in *United States v. Wilson*, 2005 WL 78552 (D. Utah Jan. 13, 2005), which shared this conclusion. In his assessment in *Wilson*, on the day after *Booker* was decided, Judge Cassell explained at length the reasons supporting this view. As he stated, the Guidelines represent the product of an expert commission, which has studied the sentencing process at great length, under the specific mandate of Congress to fashion recommended sentences which carry out the purposes defined by Congress. The resulting Guidelines, *Wilson* held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to Congressional preference. *Wilson* further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves

the purpose of deterrence as well as punishment and fairness. For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." *Id*. at 1.

Accordingly, a sentence within the guideline range is presumptively reasonable, and accommodates the Congressional purpose, affirmed by the Supreme Court, of obtaining fair sentences which are uniform to the extent possible. The government anticipates that only sentences outside the Guideline range will be subject to appellate scrutiny for reasonableness in light of the Congressional mandate.

II.   Government's Recommendation

In this case no unusual circumstances exist which warrant an exception to the preference for Guideline sentencing. Therefore, the government respectfully recommends that the Court sentence the defendant at the high end of Guideline range calculated in the PSR. Such a sentence would recognize the seriousness of the defendant's offense conduct and the enormous impact upon the victims. The government believes the following Guideline issues remain disputed between the parties.

A.   Role in the Offense (Leadership)

The government submits that the defendant was an organizer or leader of the criminal activity involving at least five participants with respect to the "billahead" and premium financing schemes. Rosby was convicted of, among other crimes, conspiracy to commit mail and wire fraud involving the fraudulent procurement of loans from Congress Financial, A.I. Credit and Anthem Premium Finance. Guideline 3B1.1, note 1, defines a "participant" as one who is

4

criminally responsible for the commission of the offense, but need not have been convicted. In this case, there were at least five participants in the criminal activity. Guideline 3B1.1, note 4, described factors that can be considered in deciding whether a person is a leader or organizer, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, . . . the degree of participation in planning or organizing the offense . . . and the degree of control and authority exercised over others. More than one person can qualify as a leader or organizer."

The evidence indicates that Rosby was a participant and, therefore, he should be counted. U. S. v. Schweihs, 971 F.2d 1302, 1328 (7th Cir. 1992). In addition his co-defendant, John Franklin, convicted of the same offenses, was also a participant. With regard to the conspiracy to obtain fraudulent loans from Congress, A.I. Credit and Anthem, at least four other individuals were also participants. Specifically, Michael Peterson, who pled guilty to fraud in obtaining loans from A.I. Credit and Anthem was a participant. He testified that he took direction from Rosby and Franklin. Next Miles Holsworth, who received immunity from prosecution, testified that he was involved in obtaining the loans from A.I. Credit and Anthem and that he knew at least one of them was fraudulent. Holsworth further testified that he kept accurate records of the billaheads to insure that Monon did not unwittingly submit to Congress fraudulent accounts receivable with respect to the same orders for trailers/containers previously used to submit false accounts receivable. Last the following employees were also knowingly involved in obtaining fraudulent loans from Congress Financial. Each testified that he/she knew that they were involved in the submission of false account receivables to Congress Financial. Michael Hogan was involved daily in determining how much to "bill ahead", that is to determine how much in

5

fraudulent account receivables to report to Congress Financial to get loans for which Monon was not eligible. In addition, Jim Bowman testified he knew that Monon was obtaining loans for producing trailers which were not produced. He also testified as to his role in determining the amount of fraudulent loans obtained each day. Candace Rogers also testified she knew she was providing Congress Financial with false information during the daily process that resulted in Congress funding Monon's operating account.

Alternatively, the enhancement applies because the criminal activity was "otherwise extensive." In United States v. Tai, 41 F.3d 1170, 1175 (7th Cir. 1994), the Court held that a determination that a criminal activity was "otherwise extensive" could based be based on "some combination of participants and outsiders equaling a number greater than five." In addition, the Court also held that district courts are free to examine factors in addition to a headcount to justify a finding that the criminal activity is extensive. Id. citing United States v. McKenzie, 922 F.2d 1323, 1339 (7th Cir.). The evidence clearly establishes a combination of participants and outsiders equaling more than five persons were involved in the scheme to defraud Congress, A.I. Credit and Anthem. Moreover, the evidence at trial established a comprehensive, well- planned scheme perpetrated by defendant Rosby and co-defendant Franklin.

The enhancement provided by 3B1.1(a) does not require that Rosby personally or directly control all of the participants. U.S.v. McGuire, 957 F.2d 310, 315-17 (7th Cir. 1992). Given the testimony regarding his management style and control, the enhancement is applicable. Rosby was the CEO of Monon. The testimony of Walter Cisowski and Jo Thomson was that Rosby was the boss and made all decisions. According to Bowman's testimony, Rosby was given reports on a daily basis indicating the status of the "bill aheads". Michael Peterson testified that Rosby

6

directed him to obtain the premium finance loan eventually used to pay CFI and directed him to wire the proceeds of the loan to CFI. Miles Holsworth also testified that Rosby directed and managed Monon. Accordingly, the enhancement under 3B1.1(a) should apply. .

      B.     Loss Amount

The Sentencing Guidelines provide very little guidance on calculating loss for transactions involving complex financing arrangements, such as assignments of rights and security interests. The 1995 Guidelines, which are to be applied in this case, do not define "loss." However, the commentary does provide guidance in determining the loss in fraudulent loan application cases, such as the one at bar. Application Note 7(b) to U.S.S.G. 2F1.1 states in relevant part as follows:

> In fraudulent loan application cases ..., the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used.

Therefore, in fraudulent loan cases the Court must use either the actual loss or the intended loss to the victim, whichever is greater.

In United States v. Morris, 80 F.3rd 1151, 1171 (7th Cir. 1996), the court stated that actual loss in a fraudulent loan case is determined by "subtracting from the face amount of the loan both the amount repaid prior to discovery of the fraud and any amount to be recovered from assets pledged as collateral to secure the loan." See also, United States v. Saunders, 129 F.3d 925, 930 (7th Cir. 1997) (discussing the calculation of loss in fraudulent loan cases). In United States v. Lane, 323 F.3d 568, 586 (7th Cir.2003), the Court stated that intended loss is the

amount of money that the defendant places at risk as a result of the fraudulent loan application.[1]
The Court went on to say that in a fraudulent loan application case, the unsecured portion of a loan is a common-sense estimate of the risk faced by a lending institution. Id.  Only payments made and collateral pledged prior to discovery of the fraud are to be subtracted from the face amount of the loan to determine loss.  Credit is not given for payments made or collateral pledged after discovery of the fraud. United States v. Mau, 45 F.3d 212, 216 (7th Cir.1995); Saunders, supra, at 931, fn.4.  The government believes that actual and intended loss are the same with respect to the fraudulent loan transactions herein.

*Congress Financial*

Despite the complexity of the loan agreement between Congress and Monon, the loss is readily determinable by following the instructions provided by the Guidelines with respect to fraudulent loans.  In the instant case, the amount of loans not repaid at the time the offense was discovered was at least $5,900,000.00, as established by the testimony of Keith Chapman and the Forebearance Agreement.  The defendants falsely represented the existence of collateral for the outstanding loans totaling $5,900,000.00 - i.e. misrepresented that the trailers and containers had been built.   At the time of discovery of the offense, August 14-15, 1996, the trailers which were to collateralize the loans had not been built.    Therefore, in determining the loss there is nothing to offset against the $5,900,000.00 fraudulent loan amount.    The amount of $5.9  million already credits collateral pledged.  The evidence established that $41,560,343.42 in false account receivables were submitted to Congress Financial between March and August 14, 1996.  Monon "backed off" most of these "bill-aheads" - i.e. built the trailers and paid off those fraudulent

---

[1] In Lane the defendant was sentenced under the November 1, 2000, guidelines. Application Note 8(b) of 2F1.1 of the November 1, 2000 guidelines is identical to Application Note 7(b) of the November 1, 1995 guidelines.

loans. However, the amount of "bill-aheads" not "backed off" by the date of discovery was approximately $5,900,000.00, the actual loss. Defendants' arguments with respect to subsequently pledged assets and assumption of the loan by a successor company[2] do not effect the loss calculation.

Application Note 8 to U.S.S.G. § 2F1.1 makes clear the Court need not determine the loss precisely and need only make a reasonable estimate of the loss on the basis of available information. As set forth above, a reasonable estimate of the loss for sentencing purposes is $5,900,000.00.

### A.I. Credit

The evidence at trial established that defendants Rosby and Franklin fraudulently obtained two premium finance loans from A.I. Credit in April and May 1996 totaling $3,649,360. Testimony at trial established that in August 1996, Monon paid to A.I. Credit $1,016,015. Following Monon's bankruptcy in November 1996, the trustee in bankruptcy filed a preferential transfer action to recoup from A.I. Credit the $1,016,015 Monon had paid in August 1996, plus an additional $466,937, Monon had paid A.I. Credit on the two loans. A.I. Credit settled with the Trustee by repaying $800,000 to the bankruptcy estate. Accordingly, A.I. Credit's actual loss on the two fraudulently obtained premium finance loans was $2,657,144.

### Anthem Premium Finance

The evidence at trial established that defendants Rosby and Franklin fraudulently obtained two premium finance loans from Anthem Premium Finance in March and May 1996

---

[2] Defendants are not entitled to reduce the amount of loss on the basis of a third-party's assumption of the debt. See United States v. Lane, 323 F.3d 568, 587 (7th Cir.2003) (holding that the guidelines do not contemplate the attribution of third-party guarantees to the actual loss calculation)

9

totaling $5,546,855. Anthem has submitted a Victim Impact Statement establishing the amount unpaid on those two loans as of December 31, 1996, was $4,866,501, which would represent the actual loss under the guidelines.

Rosby contests the amount of loss arguing that the government charged the March 29, 1996, Premium Finance Agreement (PFA) with Anthem, but the April 1, 1996 PFA was actually funded. Therefore, the loss attributed to the March 29 PFA should not be included. Defendant ignores the Indictment charged "on or about" March 29, 1996. Moreover, the evidence established that the funding was in fact of the March 29th PFA. The funding check matched the loan proceeds amount on the March 29 PFA. Will McPherson's April 1, 1996 letter to Anthem referred to the March 29 PFA as the PFA for which Legion/Mutual agreed to provide Anthem collateral in the Bermuda account up to the amount of the loan.

Rosby argues for a credit of $324,352.00 against Anthem's loss due to a payment to Legion Insurance Co. by Peterson. Rosby's position presupposes some legitimacy to the May 31 borrowing. However, the May 31, 1996 PFA borrowing was obtained through a series of false representations. Defendants caused to be falsely represented a policy number relating to an insurance policy; that the loan was to pay the 1996-1997 premium and that the premium was due in a lump sum. The payment for which Rosby seeks credit was not made to the false policy listed on the PFA, but rather on Monon's actual policy.

Rosby seeks credit for a payment of $300,000.00 made by Peterson on July 11, 1996. Rosby indicates the $300,000.00 payment was applied to the May 31, 1996 PFA. In addition, he states, "Monon <u>had to have made</u> three monthly loan repayments of $364,280.00..." This falls well short of evidence; it is an assumption. Absent some evidence of payments, no credit should be given. Further as noted above, Monon had other borrowings from Anthem. The payments

10

could have been applied to any of the borrowings. If the payments were applied to any of the other borrowings not charged, Rosby would not be entitled to credit. Moreover, Anthem attached account summaries to its Victim Impact Statement showing all payments made on the fraudulent loans. Presumably, the loss figure submitted by Anthem includes all payments made by all sources.

    C.    <u>Obstruction</u>

The government maintains that a two-level enhancement pursuant to U.S.S.G. §3C1.1 for providing false testimony at trial is warranted. The government adopts herein its position as set forth in the Pre-sentence Investigation Report.

    D.    <u>Restitution</u>

Restitution operates to make the victim of the crime whole. A victim is "a person directly and proximately harmed as result of the commission of an offense for which restitution may be ordered." 18 U.S.C. 3663A(a)(2). Full restitution is owed "in which an identifiable victim or victims has suffered ... pecuniary loss". 18 U.S.C. 3663A(c)(1). "The court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. 3664(f)(1)(A). The government has the burden of proving the loss by a preponderance of evidence. 18 U.S.C. 3663A(e).

**Congress Financial**

The amount of loss for guideline purposes is not the same as the restitution amount due Congress. The government believes the restitution due Congress is $1.8 million based on information recently provided the government. Congress has advised that HP Monon, which assumed Monon's indebtedness to Congress, including the $5.9 million in fraudulent loans, was

sold. Congress has advised that it wrote off $1.8 million in principal and $1.5 million in interest with respect to the assumed loans. Since the guidelines do not allow for the recovery of interest, the amount of restitution due Congress is $1.8 million.

**A.I. Credit**

The government has recently been informed that A.I. Credit received $675,000 in settlement of A.I. Credit's civil suit against Mutual Indemnity, Ltd, Commonwealth Risk Services, Inc., William McPherson and Legion Insurance Company (the "MRM" Parties"), with respect to the two premium finance loans. In addition, co-defendant Michael Peterson has to date paid restitution to A.I. Credit in the amount of $2,251.00 . Accordingly, A.I. Credit is entitled to restitution from defendant Rosby in the amount of $1,979,893.00.

**Anthem Premium Finance**

Anthem has submitted a Victim Impact Statement establishing $4,866,501 as the amount unpaid with regard to the two premium finance loans.

E.  Fine

The government believes that a fine should be imposed if the restitution amount does not prevent an ability to pay the fine. Without the Court's ruling on loss amount and restitution, the government cannot make a specific recommendation at this time.

F.  Downward Departure

Defendant has filed motions for downward departure based pursuant to U.S.S.G. § 2F1.1 (Loss Overstates the Seriousness of the Offense); U.S.S.G. § 5K2.10 (Victim's Conduct); and U.S.S.G. § 5K2.13 (Diminished Capacity). The government has filed its response to each of the asserted grounds for departure, arguing each is without merit.

WHEREFORE, for all of the above reasons, the government respectfully recommends that the Court impose a period of incarceration within the high end of Guidelines range established by the PSR.

    Respectfully submitted,

    JOSEPH S. VAN BOKKELEN
    UNITED STATES ATTORNEY


    s/ Orest Szewciw
    Orest Szewciw
    Assistant United States Attorney


    s/ Robin Morlock
    Robin Morlock
    Assistant United States Attorney

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO. 2:01 CR 13 JM |
| | ) | |
| THOMAS J. ROSBY | ) | |

CERTIFICATE OF SERVICE

The undersigned hereby certifies that the GOVERNMENT'S SENTENCING MEMORANDUM was electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of said filing to the following individual:

CLARK W. HOLESINGER
(Attorney for defendant Franklin)

and hereby certifies that a copy of said filing was sent by First-Class mail to the following non-CM/ECF participant:

MICHAEL B. NASH
Suite 620
53 West Jackson Boulevard
Chicago, Illinois 60605
(Attorney for defendant Rosby)

By:   s/ Janet L. Eisenmann
      Janet L. Eisenmann
      U.S. Attorney's Office
      5400 Federal Plaza, Suite 1500
      Hammond, Indiana 46320
      (219) 937-5500

14